

**SIGNED this 16th day of July, 2012.**

_____
**CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-61300-CAG |
| | § | |
| LARRY SCOTT BOSSIER, II, | § | CHAPTER 7 |
| Debtor. | § | |

| | | |
|---|---|---|
| AMERICAN NATIONAL | § | |
| INSURANCE COMPANY, | § | |
| Plaintiff, | § | |
| | § | ADV. NO. 11-06002-CAG |
| v. | § | |
| | § | |
| LARRY SCOTT BOSSIER, II, | § | |
| a/k/a LARRY SCOTT BOSSIER | § | |
| Defendant. | § | |

**MEMORANDUM OPINION DENYING THE PLAINTIFF'S
COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

Came on to be considered for trial on April 18 and 19, 2012, the Plaintiff's Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523. For the reasons stated herein, the Court finds that the Defendant's debt to Plaintiff is dischargeable pursuant to 11 U.S.C. § 523(a)(4).

As an initial matter, the Court finds that it has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding as defined under 28 U.S.C. § 157(b)(2)(I). The Court finds venue is proper under 28 U.S.C. § 1408. This matter is referred to the Court pursuant to the District's Standing Order on Reference. The Court makes its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

Defendant Larry Scott Bossier, II, a/k/a Larry Scott Bossier ("Bossier"), was the one-half owner of an automobile dealership, Bossier Country, Fairfield, Texas ("Bossier Country") from 1987 to 2009. Plaintiff American National Insurance Company ("ANICO") is a creditor of Defendant Bossier in Bossier's individual Chapter 7 bankruptcy filed in this Court. *In re Larry Scott Bossier, II*, Case No. 10-61300-CAG.

On or about August 17, 1999, Bossier executed an agent's contract with ANICO, which authorized Bossier as ANICO's agent to solicit credit life and/or credit accident and health ("CLAH") insurance to eligible customers of Bossier Country in conjunction with financed sales of vehicles (the "Agent's Contract"). The CLAH insurance would guarantee the payments of the vehicle loans in the event that the insured died or became disabled while the vehicle loan was outstanding. The CLAH policies were single premium policies; each customer paid for the policy in full at the time of issuance of the underlying loan. Upon ANICO's approval of a customer's CLAH policy, Bossier was to retain a certain percentage of the premium as his commission and forward the remainder to ANICO. If the CLAH policy was terminated early because the underlying vehicle loan was terminated early or the insured cancelled the policy,[1] the insured was entitled to a refund of the unearned premium—the portion of the premium

---

[1] There may be other reasons that a CLAH policy is terminated early, for instance, the insured cancels the insurance policy before the insurance runs its full coverage period.

2

corresponding to the unexpired term of the loan. In addition, Bossier was to refund ANICO the unearned commission—the portion of the commission corresponding to the unearned premium.

The Agent's Contract operated from August 16, 1999 to August 30, 2006. On the same day that the Agent's Contract was executed, Bossier assigned all commissions under the Agent's Contract to Bossier Country pursuant to an Assignment of Commissions. Plaintiff ("P") -1.

In 2005, a few CLAH policy holders filed lawsuits against ANICO in Georgia purporting to represent a class of individuals throughout the United States and several territories who had not received unearned premium refunds on CLAH policies (the "Georgia Actions"). Although ANICO denied knowledge of early terminated loans, plaintiffs in the Georgia Actions alleged that ANICO had such knowledge through its agents—even though some agents did not notify ANICO on some early terminations. The plaintiffs also alleged that ANICO failed to identify all insureds due a refund of unearned premiums. In 2006, the State of Texas filed a lawsuit against ANICO (the "Texas Action") for essentially the same claims that were asserted in the Georgia Actions.

ANICO subsequently settled both the Texas Action and the Georgia Actions. Under the settlement of the Texas Action, ANICO refunded unearned premiums to CLAH policyholders.[2] Under the settlement of the Georgia Actions, ANICO spent money and resources to identify all individuals due a refund, and in April of 2009, issued refunds of unearned premiums to all class members.

---

[2] In the Texas Action, ANICO provided all CLAH policies to the Attorney General of Texas, who contacted lenders and insureds to identify early terminations. The Attorney General then informed ANICO of those identified early terminations, which were subsequently processed by ANICO for refunds. The refund process in the Texas Action was, therefore, different from that in the Georgia Actions, in that it was ANICO that spent most of the efforts and expenses to identify the insureds. Therefore, different methods to calculate damages have to be implemented for the two class actions, if any damages need to be determined.

3

Thereafter, ANICO notified Bossier that ANICO, in settling both actions, had refunded the unearned premiums to the insureds, including Bossier's customers, and demanded that Bossier refund ANICO the unearned commissions. Bossier failed to refund ANICO such unearned commissions. On April 21, 2010, ANICO filed a suit against Bossier in the District Court of Galveston County, Texas, for damages due to Bossier's failure to pay ANICO the unearned commissions and ANICO's expenses in settling the Georgia Actions and the Texas Action. *American Nat'l Ins. v. Scott Bossier,* Case No. 10-CV-1103 (the "Galveston Action").

On October 20, 2010, Bossier filed the above numbered Chapter 7 bankruptcy case in this Court. Pursuant to 11 U.S.C § 362, the Galveston Action was stayed. On January 21, 2011, ANICO timely filed the Complaint in the instant adversary proceeding to determine the dischargeability of certain debts of Bossier pursuant to 11 U.S.C § 523(a)(4). On July 25, 2011, ANICO filed a Motion for Partial Summary Judgment for unearned commissions withheld by Bossier (docket no. 9), and on August 23, 2011, Bossier filed a Motion for Summary Judgment for discharging his debt to ANICO (docket no. 27). The Court held a hearing on November 15, 2011, and denied both motions. Subsequently, a trial was held on April 18 and 19, 2012 to resolve the instant matter.

## PARTIES' CONTENTIONS

In the Complaint, ANICO alleges that Bossier, when serving as ANICO's agent for the solicitation of the CLAH insurance, breached his fiduciary duty by concealing and failing to make reasonable efforts to access sources of information regarding prepayments and early terminations of loans. As a result, ANICO contends that it was injured by, among other things, having to defend itself in the Georgia Actions and the Texas Action. Specifically, according to ANICO, in settling the two class action suits, ANICO incurred a total of $18,352,701 for

4

identifying insureds due unearned premium refunds, for calculating the amounts of such refunds, and in fees to resolve the claims. Because ANICO issued to its insureds a total of 113,365 refund checks, out of which 987 were issued to Bossier's customers, ANICO seeks damages from Bossier for Bossier's proportionate share in the amount of $159,785.79.[3]

In addition, ANICO alleges that Bossier also breached his fiduciary duty by failing and refusing to refund unearned commissions to ANICO after being notified that the unearned premiums had been refunded to the insureds. As a result, ANICO contends that it was also injured by being deprived of such unearned commissions by Bossier in the amount of more than $133,206.10.

According to ANICO, Bossier's misconduct giving rise to his debts to ANICO constitutes fraud or defalcation while acting in a fiduciary capacity, and/or embezzlement as those terms are used in 11 U.S.C. § 523(a)(4). Therefore, ANICO alleges that Bossier's debts owed to ANICO are not dischargeable pursuant to 11 U.S.C. § 523(a)(4). Finally, ANICO seeks attorney's fees pursuant to the Texas Civil Practice & Remedies Code § 38.001(8) based on a suit on a written contract.

In response, Bossier denies all of ANICO's allegations.

## FINDINGS OF FACT

Bossier Chrysler Dodge II, Inc., a car dealership in Fairfield, Texas, was formed in May 1987, and converted to Bossier Country, LP, in December 2002. Both entities used the trade name Bossier Country. Bossier was an owner of both entities. As to Bossier Country, Bossier and Randy Pretzer were co-owners, each holding one-half interest. Bossier also served as chief

---

[3] At trial, ANICO sought $102,575.00 instead of $159,785.79 alleged in the Complaint, for Bossier's proportionate share of ANICO's expenses in settling the two class action suits. To calculate Bossier's proportionate share, ANICO in its Complaint used the ratio of 987 to 113,365, but at trial ANICO used the ratio of the monetary amount of the 987 checks to that of the 113,365 checks.

5

financial officer of Bossier Country. Pretzer began serving as general manager for the dealership in charge of operations in 1992.

On or about August 17, 1999, Bossier signed the Agent's Contract with ANICO, which provided in relevant part:

> The agent shall be subject to and governed by the Company's written rules, regulations and other instructions governing the solicitation of the insurance authorized under this Contract . . . . The Agent agrees to comply with the insurance laws and regulations of all of the states in which the Agent solicits insurance under this Contract.
> . . .
> The agent specifically understands and agrees that checks for premiums, unearned commissions and other insurance remittances shall be made payable to "American National Insurance Company" . . . . All monies received by the Agent for on behalf of the Company shall be kept entirely separate and distinct from other funds. Such funds shall be held by the Agent as a fiduciary and not be commingled for use by the Agent for any personal or other purpose whatever, and the Agent shall forthwith pay over the same in cash to the Company.
> . . .
> In the event that insurance on any debtor is terminated during a prepaid period, the Company shall refund the unearned premium and the Agent shall, upon receipt of notice thereof, immediately refund to the Company . . . the unearned portion of any commissions previously paid or allowed hereunder.
> . . .
> This Contract is not assignable. No assignment of commission payable hereunder shall be valid unless authorized in writing by the Company. An assignment of commission shall not relieve the agent of any of the agent's obligations under this contract, including the obligation to refund unearned commissions.

(P-1); Defendant's ("D") exhibit 1 (D-1). The Agent's Contract remained in force until ANICO terminated the contract on August 30, 2006. Pursuant to the Agent's Contract, the obligation to repay unearned commissions survived termination.

Concurrently with the execution of the Agent's Contract, an Assignment of Commissions was executed, whereby all agent's commissions due under the Agent's Contract would be paid to Bossier Country. Bossier signed the Assignment as assignee on behalf of Bossier Country, and

6

Pretzer signed the Assignment as assignor on behalf of Bossier. Both the Agent's Contract and the Assignment of Commissions were approved and signed by ANICO's Senior Vice President, who did not appear before the Court to testify.

Pursuant to the Agent's Contract, for each CLAH policy solicited, Bossier Country would retain a percentage of the premium as commission and forward the remainder to ANICO. In addition, for each early termination or cancellation, Bossier Country was obligated to refund the unearned premium to the customer and request a refund from ANICO for the difference between the unearned premium and the unearned commission. Both the solicited and terminated policies would be recorded in a monthly Report of Remittance prepared by Bossier Country and sent to ANICO. The amount due ANICO as to the solicited policies and the amount due Bossier Country as to the early terminations would be calculated. The difference between the two would be the net amount due ANICO from Bossier Country, and the money would be transferred from Bossier Country to ANICO. It was uncontroverted that the above procedures constituted the basic framework of the operations on CLAH insurance under the Agent's Contract, and that these operations were carried out from August 16, 1999 to August 30, 2006. The parties, however, contested some details of the operations.

Bossier testified that he did not consider himself personally owing ANICO duties under the Agent Contract because he delegated responsibilities to the employees at Bossier Country and personally did not receive any commissions. Bossier maintained that he, except on one or two occasions, did not personally sell CLAH policies, and did not involve himself in the daily operations as to CLAH insurance. Instead, Pretzer, as general manger for Bossier Country, handled all aspects of administration of the Agent's Contract, and the employees at Bossier Country carried out specific operations including soliciting policies, collecting premiums,

7

handling early terminations, and preparing monthly Reports of Remittance. Further, Bossier testified that he also relied on a general agent of ANICO, named Richard McCarver, who visited Bossier Country at least once per month, and sometimes helped Bossier Country to prepare monthly Reports of Remittance to ANICO. McCarver, however, did not appear before the Court to testify.

Bossier also testified that he had no personal knowledge with regard to how early terminations were processed at Bossier Country and denied concealing from ANICO such information or knowledge thereof.[4] Bossier testified that the cancellations would presumptively be put into the corresponding customers' files that were kept at Bossier Country, but he had no personal knowledge of these customers' files. Suzanne Garcia, a former employee of Bossier Country handling paper work on CLAH policies, testified that she did not personally receive any letters of early terminations of CLAH policies. Pretzer, as Garcia testified, forwarded the termination letters, to her. Pretzer testified that he did receive termination letters from lenders, and occasionally from customers, but did not know where those letters went. Pretzer denied that he maintained copies of termination files in his office and further testified that McCarver had access to the database at Bossier Country that contained all CLAH policies including early terminations. Carlos Delgado, a designated representative for ANICO, testified that he could not specify any early termination that Bossier concealed or was aware of being concealed from ANICO. Before 2006, there was no complaint or allegations by ANICO that Bossier Country fraudulently concealed information on early terminations.

---

[4] When a customer cancelled a CLAH policy or the underlying loan was terminated early, the customer or the lenders would notify Bossier Country. Evidence was not clear on how many customers who cancelled the CLAH policy actually notified Bossier Country and how many did not. Evidence was not clear either on whether the lenders notified Bossier Country on every loan that was terminated early. Further, evidence was not clear on whether every notification on cancellation or early termination that Bossier Country received was inputted into the database.

8

In 2005, a few CLAH policyholders filed the Georgia Actions against ANICO for refunds of unearned premiums, and in 2006, the State of Texas filed the Texas Action against ANICO for similar claims. ANICO discovered that many insureds who were due refunds of unearned premiums were not reported to ANICO by ANICO's agents, including Bossier Country. ANICO ultimately settled both class actions and refunded unearned premiums to the insureds. In October 2007, ANICO started sending statements to Bossier Country demanding that Bossier Country refund ANICO the unearned commissions. For instance, a statement sent from ANICO to Bossier Country on October 31, 2007, listed the insureds identified in the Texas Action who were Bossier Country's customers and due unearned premiums. *See* P-3. The statement also listed the amount of all the unearned premiums that ANICO had paid to the insureds and the corresponding unearned commission that Bossier Country was obligated to refund ANICO in the amount of $69,954.95. Similarly, the statement sent from ANICO to Bossier Country on April 30, 2009 listed the insureds due unearned premiums identified in the Georgia Actions, and the corresponding unearned commission was $58,607.20. *See* P-4.

Due to the economic downturn starting in 2007, the sales of vehicles declined significantly at Bossier Country. In 2008, Bossier Country obtained $1,000,000 in working capital by way of a loan secured by company-owned real property and $825,000 contributed by Bossier individually from his personal funds.[5] These infusions of capital, however, did not

---

[5] Bossier testified that in spring of 2009, Chrysler put restrictions on some of Bossier Country's funds, and as a result, approximately $1,000,000 was tied up and could not be used by Bossier Country to pay other obligations, such as the unearned commissions owed to ANICO. Notably, ANICO started to send statements to Bossier Country in October 2007, more than a year before Chrysler restricted its funds. In addition, at least in 2008, Bossier Country could obtain a $1,000,000 loan secured by real property and $825,000 from Bossier personally to fund dealership operations. Bossier Country's failure to pay ANICO had little to do with Chrysler's restriction in 2009.

9

remedy the financial distress of Bossier Country. In November 2009, Bossier Country filed a petition in bankruptcy.[6] In March of 2010, Bossier Country was closed for business.

On April 21, 2010, ANICO filed a suit against Bossier in the state court for damages due to Bossier's failure to pay ANICO unearned commissions and ANICO's expenses in settling the Georgia Actions and the Texas Action. On October 19, 2010, ANICO sought discovery on all Bossier Country's customer files, which contained information on early cancellations of CLAH policies from 1999 to 2006. On October 20, 2010, Bossier personally filed the bankruptcy under Chapter 7 in this Court, and the state court action was stayed. An email from Bossier to Pretzer stated that ANICO's state action against Bossier was basically what precipitated Bossier's need to file personal bankruptcy. *See* P-15.

Bossier testified that he had possession until early 2011 of the customer files containing early terminations from 1999 to 2006. Bossier further testified that in early 2011, he had those customer files destroyed because he was told by his bankruptcy counsel that his personal debts, including those owed to ANICO, were discharged,[7] and he believed those files, also containing personal information such as social security numbers, were outdated and needed to be destroyed. Bossier, consequently, did not and could not produce those customers' files upon ANICO's request for discovery in this adversary proceeding in June 2011.

## ANALYSIS

Plaintiff alleges that the Defendant's conduct regarding the administration of the CLAH contract is a breach of fiduciary duty as defined under the contract. Complaint at ¶ 29.

---

[6] Bossier Country filed its business bankruptcy under Chapter 11, and the case was later converted to Chapter 7. *In re Bossier Country LP*, Case No: 09-61303-CAG. On March 1, 2010, ANICO filed a proof of claim for refund of unearned commissions under Agent's Contract for an amount of $133,206.10 and expenses incurred in settling the two class action suits for an amount of $102,575.00, which are the same amount that ANICO is seeking in this case. Bossier Country's bankruptcy was a no-asset case, and ANICO did not get distributions.

[7] The deadline for challenging the dischargeability of Bossier's debts was January 24, 2011. ANICO filed this adversary proceeding to challenge the dischargeability of certain Bossier's debts on January 21, 2011.

Specifically, ANICO alleges that Bossier owed ANICO the duties of loyalty, good faith, honest dealing, and the duty not to conceal matters that might influence his actions to his principal's prejudice. *Id*. Further, ANICO alleges that Bossier breached his fiduciary duty by concealing information, failing to make reasonable efforts to access information, and, as a result, not assisting ANICO in determining and identifying prepayments and early termination of loans that affected insurance premiums under the Agent's Contract. *Id*. at ¶ 30. Plaintiff argues that Bossier breached his fiduciary duty to ANICO by failing and refusing to refund unearned commissions after being notified by ANICO that such unearned premiums were refunded. *Id*.

In addition, ANICO makes the general allegation that Bossier's acts and omissions constitute fraud or defalcation while acting in a fiduciary capacity and/or embezzlement under 11 U.S.C. § 523 (a)(4).

## EMBEZZLEMENT

Section 523(a)(4) states that a debt is non-dischargeable "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The plaintiff's burden to prove a violation of section 523(a)(4) is by a preponderance of the evidence. ***Master-Halco, Inc. v. Sanchez (In re Sanchez)***, 2009 WL 1657991 *5 (Bankr. S.D. Tex. 2009). This Court has found that embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property was intrusted or into whose hands it has lawfully come." ***Franklin, S.S.B. v. Barnes (In re Barnes)***, 369 B.R. 298, 305 (Bankr. W.D. Tex. 2007) (citations omitted). Further, the Fifth Circuit has held that the plain language of the statute and limited congressional intent indicate that section 523(a)(4) was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts. *Id*. (citing ***Matter of Boyle***, 819 F.2d 583, 588 (5th Cir. 1987)). As

11

such, both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's. *Id*.

To begin its analysis, the Court must first determine whether the money in question was Debtor's, Bossier Country's, or ANICO's. The commissions at issue were assigned to Bossier Country with ANICO's consent. *See* P-1. Until ANICO made a demand for reimbursement of the unearned commissions, the commissions belonged to Bossier Country under the Agent's Contract. Other than a vague reference to embezzlement, the Plaintiff offers no explanation as to how Bossier embezzled funds from ANICO if Bossier first assigned the funds to Bossier Country and had no control over the commissions after they were paid to Bossier Country. The Plaintiff failed to offer any evidence that Bossier, or someone at his direction, commingled funds with those of Bossier Country. Moreover, there was no showing that Bossier used any of the unearned commissions for his personal use. Bossier testified at length how he did not have access or control the commissions after they were assigned to Bossier Country. He further testified that he relied on Pretzer to administer the ANICO contracts and other employees dealt directly with ANICO's representative on the monthly accounting of premiums and commission payments.

ANICO argues that under the Texas Insurance Code an agent who collects premiums or money of behalf of the insurer commits embezzlement if he (1) embezzles, converts, or appropriates money or substitute for money; or (2) with intent to embezzle and contrary to the instructions of the insurer takes or secrets or otherwise disposes any money received in the person's capacity as an agent. Tex. Ins. Code § 4005.153. As such, how did Bossier commit embezzlement when he failed to return the unearned commissions to ANICO upon getting notice from ANICO of Defendant's obligation to do so? The commissions, when originally paid,

12

belonged to the Defendant who assigned the commissions to Bossier Country. This Court has found that no person can embezzle from himself. *Barnes* 369 B.R. at 305. The Plaintiff did not provide any oral evidence at trial or through admitted exhibits that in any way demonstrated that Defendant embezzled Plaintiff's property. The failure to remit the unearned premiums does not constitute embezzlement. It is at most a breach of the Agent's Contract when Bossier failed to remit the moneys. As such, the Plaintiff's claim as to embezzlement is denied.

### DEFALCATION

The Fifth Circuit in *In re Schwager*, 121 F.3d 177, 184 (5th Cir. 1997) stated that there is a long line of cases in the Circuit that have defined defalcation as "a willful neglect of duty, even if not accompanied by fraud or embezzlement." (citations omitted). The cases that the *Schwager* court reviewed all included some level of financial misconduct by a fiduciary. Further, the *Schwager* court observed that there has been some difficulty for the courts in determining what type of mental state or intent is necessary to qualify as defalcation. *Id*. at 185. The court noted that defalcation does not require actual intent, as does fraud. The Fifth Circuit found that defalcation does not rise to the level of embezzlement, fraud, or misappropriation; but it does require some level of mental culpability. *Id.* The court held that a willful neglect of fiduciary duty constitutes defalcation, which is essentially a recklessness standard. *Id*.

As to whether there is a fiduciary relationship between ANICO and Bossier, the Fifth Circuit found in *Schwager* that the scope of fiduciary duty under section 523(a)(4) is a question of federal law; however, state law is important in determining whether a trust obligation exists. *Id*. at 186 (citation omitted). Further, the court stated that the concept of fiduciary duty is narrowly defined, applying only to technical or express trusts. *Id.* (citing **Angelle v. Reed (*In re Angelle*)**, 610 F.2d 1335 (5th Cir. 1980).

ANICO argues that Bossier is ANICO's agent as defined under the Agent's Contract. *See* P-1. Defendant does not dispute ANICO's assertion that he signed the Agent's Contract and solicited insurance on behalf of ANICO. *See* Defendant's Answer at ¶¶ 4, 17, 18. Defendant also admitted that under the Agent's Contract there is an agency relationship in which the agent has a fiduciary duty to the principal, including a duty of loyalty. As such, Plaintiff argues under Texas case law that an agent, as a fiduciary of the insurer, owes a duty of good faith and fair dealing in all transactions on the insurer's behalf. *See **American Indem. Co. v. Baumgart***, 840 S.W.2d 634, 639 (Tex. App.—Corpus Christi 1992, no writ). Moreover, Plaintiff maintains that an agent owes the insurer strict integrity, honest dealing, and the duty not to conceal matters that might influence the agent's actions to the insurer's prejudice. *Id*. Plaintiff notes that the Agent's Contract specifically required Bossier to segregate unearned commissions from other funds and hold them as a fiduciary to ANICO. The Agent's Contract further required Bossier to refund any unearned commissions upon notice being given by the insured.

Plaintiff's computer records (P-3, P-4, P-5, P-6, P-7) demonstrate that ANICO refunded uninsured premiums to its insured and notified Bossier of such refunds. As a result, Bossier had a duty at that time not to comingle or use those funds for personal use, and to refund such funds to ANICO. Plaintiff alleges that Defendant refused to refund the unearned commissions to ANICO and used the funds for either his personal use or for Bossier Country. As such, Plaintiff alleges that such conduct constitutes defalcation. *See **Barrett v. Clarendon Nat'l Ins. Co***., 1999 U.S. Dist. LEXIS 4223 at *19 (N.D. Tex. 1999) (diversion of insurance premiums belonging to insurer constituted defalcation under section 523(a)(4)).

Defendant argues that a fiduciary duty must be based on some express or technical trust that pre-dates the act creating the debt. *See **Randall v. Atkins (In re Atkins)**,* 458 B.R. 858

14

(Bankr. W.D. Tex. 2011).  As such, defalcation should be limited to express or technical trusts, not implied trusts.  The Defendant's assertion of law on the limited nature of a fiduciary duty is not correct.  This Court has found in *Walser v. Texas Music Grp., Inc. et al* (*In re Antone's Records, Inc.*), 455 B.R. 758, 780 (Bankr. W.D. Tex. 2011) that a fiduciary relationship may be based on formal or informal relations in which one person places a special confidence in another who is bound to act in good faith and with due regard for the interest of the person placing the confidence.  Further, an informal fiduciary relationship may exist based upon the circumstances surrounding a moral, social, domestic, or personal relationship.  *Id.* at 782 (citation omitted).

The evidence presented at trial shows that Bossier Country would retain a percentage of the premium as commission and forward the remainder to ANICO.  Bossier Country was obligated to refund the unearned premium to the customer.  Both the solicited and terminated policies would be recorded in a monthly Report on Remittance that Bossier Country prepared and sent to ANICO.  *See* P-14.  As noted *supra* at p. 7, it was uncontroverted that the procedures described herein were the basic frame work of the operations under the CLAH insurance under the Agent's Contract, and that these operations were carried out over the term of the 1999 contract.

That said, the evidence presented becomes controverted as to the Defendant's involvement in Bossier Country's administration of the Agent's Contract.  Bossier testified that he was not personally involved in the sale of CLAH contracts but for a few isolated occasions, and that Pretzer handled all aspects of the administration of the Agent's Contract.  Bossier also stated that he relied upon ANICO's representative—Richard McCarver—for any issues regarding the administration of the CLAH contracts.  Without McCarver's testimony, it is difficult, if not impossible, for the Court to determine if ANICO through McCarver ever

indicated that there were issues with repayment of unearned commissions. Suzanne Garcia, a former employee of the Bossier Country, testified she did not personally receive any notices of termination of CLAH contracts. Pretzer indicated that he did receive some termination letters from lenders and customers, but did not know where those letters went. The corporate representative for ANICO, Carlos Delgado, testified that he could not specify any early termination that Bossier concealed or was aware of being concealed from ANICO. At least as of 2006, ANICO does not claim that Bossier Country fraudulently concealed information on early terminations.

Thereafter, starting in October 2007, ANICO began sending statements to Bossier Country demanding the return of unearned commissions. The Defendant, Pretzer, and Garcia all testified that they may have received some of the demand notices, but could not recall the number or frequency of the requests. *See* P-11, P-15, P-16. Bossier testified that Bossier Country began having severe economic issues due to the economy and the Chrysler bankruptcy. Notwithstanding these economic considerations, ANICO's demand for repayment preceded these economic concerns.

The Court notes that the most troubling, and inexplicable, aspect to this litigation is Bossier's testimony that after ANICO filed suit against him for repayment of the unearned premiums in April 2010, Bossier filed personal Chapter 7 bankruptcy in October 2010. Bossier then explained that during the pendency of his Chapter 7 case, and before the deadline for filing complaints to determine dischargeability of debts, Bossier (on the advice of counsel) <u>destroyed</u> client files containing early terminations from 1999 to 2006 because of his concern that he could no longer store the files and that they contained personal information of customers. ANICO

16

could have used that information to determine if there was any indication of Bossier or Bossier Country employees purposely not reporting early terminations to ANICO.

The Plaintiff would have this Court find defalcation under the Insurance Code and applicable law without the requisite showing of culpability or recklessness. That is, once it is demonstrated that a contract under agency exists, and, an attendant fiduciary relationship, the insurer is entitled to a finding of defalcation if the insurer can simply show that the funds in question were not remitted upon demand. While the Court agrees that there was a fiduciary relationship between ANICO and Bossier, and that Bossier had a duty to honor his responsibilities under the Agent's Contract, the Plaintiff has not met its burden in showing that Bossier was reckless as to non-payment of unearned commissions or that Bossier himself was complicit in not paying the unearned commissions to ANICO, or was even aware of the non-payment of unearned commissions to ANICO. The Court finds that ANICO has not met its burden under section 523(a)(4).

## CONCLUSION

For the reasons stated herein, the Plaintiff's Complaint pursuant to section 523(a)(4) is **DENIED** and Plaintiff is awarded a take nothing judgment. Each party is to bear its own costs.

# # #